IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SUSAN FLAHERTY, et al, )
Plaintiffs )
-VS- ) CA No. 20-11485-PBS
) Pages 1 - 31
AMIGOS DEL MAR LTD, as owners of the vessel M/V PAPA CHANGA doing business as Amigo Del Mar Dive Shop, et al, )
Defendants )

**MOTION HEARING BY VIDEO**

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way
Boston, Massachusetts 02210
March 6, 2025, 4:34 p.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA 02210
leemarz47@gmail.com

A P P E A R A N C E S:

JOHN MARK DICKISON, ESQ., Lawson & Weitzen, LLP, 88 Black Falcon Avenue, Suite 345, Boston, Massachusetts, 02210-2414, for the Plaintiffs.

LISA S. KANTOR, ESQ., Kantor & Kantor, LLP, 9301 Corbin Avenue, Suite 1400, Northridge, California, 91324, for the Defendants.

MALA M. RAFIK, ESQ., Rosenfeld & Rafik, P.C., 184 High Street, Suite 503, Boston, Massachusetts, 02110, for the Defendants.

P R O C E E D I N G

THE CLERK: Good afternoon, Judge.

THE COURT: Good afternoon.

THE CLERK: I have both sides on, so I'll call the case.

THE COURT: Thank you.

THE CLERK: The Court calls Civil Action 20-11485, Flaherty, et al v. Amigos Del Mar Dive Shop, et al. Could counsel please identify themselves.

MR. DICKISON: Mark Dickison for Susan, Robert, and Daniel Flaherty.

MS. KANTOR: Good afternoon, your Honor. Lisa Kantor and Mala Rafik for the defendants. We also have our client, Krista Paz, on the phone.

THE COURT: Wait a minute. So who am I seeing? Who else am I seeing on?

MR. DICKISON: You're also seeing Susan Flaherty, which is my client, your Honor.

THE COURT: All right, so I think everyone who's arguing should stay on the line, and anyone who's not arguing should turn off their cameras. Otherwise I get too confused looking at all the boxes. So who's arguing?

MR. DICKISON: I'm arguing for the plaintiffs.

THE COURT: All right. Your client needs to probably take her video off.

MR. DICKISON: Susan, can you hear the Judge's instruction, please?

THE COURT: She's muted, but I'm still seeing her on video. Perfect. They can all watch. Just it's easier for me when I have the people who are arguing.

MR. DICKISON: Understood, your Honor.

THE COURT: So I believe the motion to vacate is filed by Amigos, so do you want to go first?

MS. KANTOR: Of course, your Honor. I mean, we filed a lot of papers, but I'm happy to answer any questions, but I will start by giving you a summary of our argument and --

THE COURT: Can I start off with one question, which is --

MS. KANTOR: Sure.

THE COURT: -- there was one statement made somewhere that took me by surprise. I'm not sure it's legally relevant, so let me be clear. We did everything we could to notify people. I mean, they were served; we sent notices in the mail. And at one point in one was briefs it said you had no notice?

MS. KANTOR: We had notice. There was one document that was not noticed on my client, and that was the default that was entered on June 21st, 2021. We have no record of notice, and we can't find notice on your docket.

THE COURT: Well, sometimes when I look at it -- I'm almost positive because I would not have gone forward with the

default hearing.

MS. KANTOR: Your Honor, we're not challenging notice. We're here about jurisdiction.

THE COURT: Okay, okay, I just wanted to make sure because we do have some staff notes in there, which is something that I don't think actually appears in the docket, that things were sent.

MS. KANTOR: Ah.

THE CLERK: Yes, but, Judge, the notice -- this is Maryellen. I'm the one who sent it. The actual notice of default, I think it might be number 11, but the notice of default is on there. It's at the beginning of the docket. I found it today. There's a staff note as well.

THE COURT: Yes, so --

THE CLERK: Yes, but it's there.

THE COURT: Okay. In any event, just I wanted to clarify that because you had mentioned it in the initial brief, I think. Okay, go on on the main issue. Go ahead.

MS. KANTOR: Okay, I'd like to start with subject matter jurisdiction, which is the issue of where the accident took place. And it's important to note that from the very beginning of this case, the plaintiff argued that the accident took place in international waters. The basis for jurisdiction was a statute, 1333, that allows the court to take jurisdiction if a tort occurs, either in U.S. waters, on U.S. waters only,

but not on international waters. The Supreme Court has been clear that the statute does not allow jurisdiction under this statute where a tort occurs in international waters.

Now, part of the confusion here is, there are other admiralty jurisdiction statutes. There's the Jones Act. There's the Death on the High Seas Act. There are a lot of cases out there that talk about those statutes, but that's not what we're talking about here.

So in the complaint, in the Declaration to Support Damages, in the two declarations filed in opposition to our motion to vacate, Ms. Flaherty repeatedly said that the accident happened on international waters. That is not so. The accident happened in Belize territorial waters.

Now, Ms. Flaherty when I took her deposition said -- I asked her what she meant when she kept saying "high seas or international waters," and she said, "I meant outside of the reef." But outside of the reef is not international waters. The reef is about a mile from shore. When I asked her what investigation she had done to support her conclusion or her assertions that this had happened in international waters, she said she had done none.

The only evidence she gave forward as to where the location of the accident was was a map that we attached as Exhibit G to my declaration. She testified that this map accurately represents all dive sites around the island of

Ambergris Caye, which is where the accident took place, outside of this island. She testified that it accurately represented, that she has been to virtually all of those dive sites, and that the only information she has about where the accident took place is represented by that map. She couldn't remember exactly which dive site it was, but she knew it was one of these dive sites.

If you look at the map, the key on the map clearly shows that every single dive site is within one mile. Every other witness testified that the accident happened at the Tackle Box dive site, that the Tackle Box dive site is within three quarters to one mile from shore. This included her own son's friend, Mr. Carballo, who said the accident happened at Tackle Box, which is within one mile of shore.

The law in the United States is that international waters begin 12 miles from shore. The law in Belize is that international waters begin 18 miles from shore. Under either way, under either law that you apply, this accident happened in Belize territorial waters, which means this Court has never had any subject matter jurisdiction over this tort.

Also we cited several cases in our papers to support --

THE COURT: Well, the cases seem to be a bit split on this on what happens on these scuba diving accidents.

MS. KANTOR: Well, I don't think they're split in the

sense that when there's a death, it's a different statute. So we can't look at cases where people die from scuba diving accidents because that's the Death on The High Seas Act, which has a different definition of "jurisdiction." We can't look at cases where an employee is hurt or dies because that's the Jones Act, and that's a different definition of "jurisdiction."

THE COURT: So tell me -- you obviously know a lot about this area -- are there any cases that have held specifically that with respect to navigable waters but not international waters, that there's no jurisdiction? In other words, here we have navigable waters, but we're most likely not in international waters.

MS. KANTOR: Right, we have navigable waters because we were on a boat, yes.

THE COURT: Right, and she was hit by the boat's propeller, so it's maritime-connected and that sort of thing. So the case seems to boil down to whether or not I have jurisdiction over something in navigable waters but not in international waters.

MS. KANTOR: Well, if I could restate it, whether you have jurisdiction over Belize territorial navigable waters versus international navigable waters, because all waters are navigable, I mean, unless you can't get a boat on it; and we're talking about, you know, some other types of cases that involve rivers that sometimes people say aren't navigable. The

question is, do you have jurisdiction over Belize territorial waters when a tort occurs in Belize territorial waters? And I would submit to you that there is not one case that has been cited by the plaintiffs where a court asserted jurisdiction and the issue was raised. In other words, there are courts who just say, "It's a navigable water, so we have jurisdiction," and don't look at, well, wait a second, is it a --

THE COURT: Well, has the First Circuit ruled on it?

MS. KANTOR: No.

THE COURT: Have they said anything in dicta or rolled on this statute at all?

MS. KANTOR: No, not that I know of.

THE COURT: Are there other circuits who have said that as long as it's navigable, you have jurisdiction?

MS. KANTOR: No, no. There are courts that take --

THE COURT: Because there are all these scuba diving cases all over the country.

MS. KANTOR: Yes. Yes, there are, but, remember, scuba diving cases in the United States do not raise this issue.

THE COURT: No, I'm talking about -- I know that, but diving cases in the Caribbean or Mexico.

MS. KANTOR: Right, right, right. There's one case that the plaintiff cited where the accident occurred in Saint Lucia, but the plaintiff was an employee, so her main basis for

jurisdiction was the Jones Act. And then she had a second cause of action against the owner of the boat, and the court just, without even looking at the Supreme Court language, said, "Okay, yeah, we have jurisdiction of that as well," without anybody raising the issue. It can't stand for the proposition, in our view, that you can assert that jurisdiction when no one raised the issue and no one evaluated it.

The cases that evaluate it are the ones that we have put in our papers that consistently say, if it's in a foreign jurisdiction's territorial waters, a federal government in the United States does not have admiralty juris- --

THE COURT: And what case specifically are you relying on that says it that clearly in a tort context, as you would say?

MS. KANTOR: Yes, in a tort context. *Dunham v. Hotel,* et cetera, 933 F. Supp. 543, Eastern District of Virginia, 1996. And it says, I quote --

THE COURT: Sorry. I believe you, but let me just -- so these are all, if I can say, District Court opinions struggling with the same --

MS. KANTOR: Yes.

THE COURT: We don't have appellate case law on this?

MS. KANTOR: No.

THE COURT: All right. Well, that's useful.

MS. KANTOR: I haven't found any, but we have a

Supreme Court case. Then the Supreme Court, you know, said that jurisdiction under this statute, 28 U.S.C. 1333, includes high seas, international waters, and the navigable waters of the United States, period. That's it, nothing else.

THE COURT: So high seas --

MS. KANTOR: Meaning international waters.

THE COURT: Did they say meaning --

MS. KANTOR: Yes. They said high -- I can get the actual quote. Let me find it. This one is -- sorry, give me a minute.

(Pause.)

THE COURT: Well, I can look it up too.

MS. KANTOR: Sorry. That might have been a paraphrase. I believe it's in the plaintiffs' brief.

THE COURT: I'll look it up. I don't want to take the time.

MS. KANTOR: Okay, if I find it, I'll let you know, if that's okay.

THE COURT: That sounds good. All right, so that's your basic argument, is that this most likely took place in Belize territorial waters and the statute doesn't apply.

Can I ask this basic. One of the things that really bugs me, just bugs me, is I gave everything I could to do notice. I had a full day's worth of hearings, and that they essentially didn't bother coming in to contest either personal

or subject matter jurisdiction. And now they've pushed it up so that unless I rule within the next month, the statute of limitations is run. I mean, that just seems grossly unfair, just grossly. I mean, are they agreeing to push the statute of limitations in Belize and to waive it?

MS. KANTOR: No one has asked us to waive the statute of limitations in Belize, but, honestly, your Honor --

THE COURT: It's unfair. This is the thing that is really getting to me. If they had come in originally and if I had agreed with you, this could have been fully and fairly litigated in Belize. I don't know if I agree with you yet. I don't understand admiralty law well enough, and it will require -- I was just going to say "a deep dive," but I didn't mean to -- I have to really understand it. And then you're putting the plaintiff, who was severely injured, severely, into a terrible position of having missed the statute of limitations in Belize. That's a pretty rotten spot to put someone in.

MS. KANTOR: You know, I have to say, your Honor, I feel like my client has been the one put in a very bad position. This happened during COVID. Belize was shut down.

THE COURT: They could have sent me an email or sent something.

MS. KANTOR: They sent a letter. They sent a letter to plaintiffs' counsel. They sent a letter. They said, "You don't have jurisdiction in Massachusetts."

THE COURT: They didn't send it to me when I held a hearing.

MS. KANTOR: I really don't know if I could ever have advised a client to send a letter to a courthouse. It wouldn't even have occurred to me if they asked me. I was not involved.

THE COURT: Everyone sends me letters, more than I want to see letters. I'm saying it happens every day of the week: "I'm sorry, I'm contesting jurisdiction. I contest the facts of the case. I'm sick from COVID. I can't make it up there. Can you continue the hearing?" I heard nothing.

MS. KANTOR: Well, plaintiffs' counsel heard, and there are legions of cases that say, that a foreign national does not have to arrive or show up in a U.S. court --

THE COURT: Excuse me. You've waited so late that now the statute of limitations by the time I rule has effectively run.

MS. KANTOR: No. According to plaintiffs, the statute hasn't run. They could file tomorrow.

THE COURT: I'm sorry. I haven't ruled yet.

MS. KANTOR: Well, but they could still file a protective action.

THE COURT: Anyway, let me hear just on the subject matter jurisdiction from plaintiffs' counsel.

MR. DICKISON: Thank you, your Honor. I mean, I want to back up in one sense, in the sense that we're having --

we're in the phase of obviously her clients are attacking the judgment. So from our view, there's the 2005 case of *Fafel v. Dipaola* from the First Circuit that says, when you're attacking subject matter jurisdiction, you've got to consider the policy consideration of the limits on federal jurisdiction and the need for judgments being final, which is what your Honor is struggling with.

THE COURT: I am struggling with it, and yet I'm also struck with the fact that no time limits that the First Circuit has set. So I'm stuck. I mean, I --

MR. DICKISON: I understand, but what *Fafel* says is that in this scenario, we only need to show an arguable basis for subject matter jurisdiction. So it meaning that if your Honor got it wrong and made an error within discretion, that's different because as long as we have an arguable basis, then we've satisfied, in the procedural posture that we're in, the requirements here. And so we have absolutely an arguable basis, your honor.

There's two cases out there that we rely on heavily. There's a Third Circuit case, *Neely v. Club Med Management Service*. That case is a 1995 case. That case is what counsel I think tried to distinguish because it did involve an employee, but this is a person -- it's almost the identical case. It was a person who was diving off a vessel who was sucked into the prop, exactly like Ms. Flaherty. And that case

did in fact find, the Third Circuit found that there was subject matter jurisdiction on 28 U.S.C. 1333, and it determined that the location test is satisfied as long as the injuries occurred in navigable waters and were caused by a vessel.

THE COURT: Was that a death case?

MR. DICKISON: No, it was not. It was a severe-injury case. I think counsel would say it's distinguishable because she was also a member of the crew, but that's not the basis that the Court found. She was an American. She was employed at a Club Med resort. This is the case off of the coast of Saint Lucia. So I think that's one of our most powerful cases.

And the other case I commend your Honor to look at is a District Court case out of Florida, Southern District of Florida, *Campbell v. Starwood Hotels*. That case is a case where a person was injured while swimming and struck by a motor boat off the coast of the Grand Bahamas, and in that case, the court directly analyzes the issue we're talking about here about whether or not the location matters. And in that case, the court said the majority of courts have held that there's no requirement that the injury had to happen on high seas or outside the territorial waters. And it also said that that's what the prominent treatises had also found at that time, that occurrences in foreign navigable waters may also ground

admiralty jurisdiction. So we commend your Honor that case.

And I think, you know, again, you're right, this does not settle -- I've looked as well and my folks who I work with have looked very hard, and we didn't find any First Circuit controlling authority here, but I think we've got an arguable basis --

THE COURT: It sounds like the only circuit that's really addressed it is the Third, which Amigos is trying to distinguish. And maybe they're right on the employer thing, but you sort of have a split in the District Courts. Is that what's happened? You're saying the treatises are on your side?

MR. DICKISON: That's what I'm saying, your Honor, at least the treatise that was cited in the *Campbell* opinion from 2008.

THE COURT: And what about the Supreme Court case that is heavily relied upon by Amigos?

MR. DICKISON: The case that my understanding governs, the Supreme Court case, is the -- I'll get the name right here -- it's the *Grubart* case, and it's been interpreted as just requiring a court on navigable water. So I guess I just disagree. And perhaps I'm not as steeped in these cases as counsel is, but I believe that the way the court -- and these are the -- the *Grubart* case is the case that's being interpreted by the Third Circuit in *Neely* and also in the *Campbell* court in the Southern District of Florida. They're

all using that analysis to determine this issue under 1333. So, your Honor, I think that's what we say. And plus, you know, I'd like to add --

THE COURT: Can I ask, are you basically -- I mean, it did seem as if -- I understand there's a split in the District Courts, you have one Third Circuit court in your favor, and maybe a difference in opinion about what the Supreme Court language is, but at least with respect to the evidence as I saw it, it looked likely that this happened within Belize territorial waters.

MR. DICKISON: I think that's a fair characterization of the evidence, though, your Honor, what I do need to have, though, what would have been definitive was the dive shop's own actual records, and they were destroyed. So that's another factor to consider in all this analysis.

THE COURT: And if it were a close call, I might agree with you, but it looked like it was pretty much virtually disputed even, even by your client, I mean, as she showed the map.

MR. DICKISON: Well, I think my client would say, if she were permitted to speak, that the map was distorted, you know, but be that as it may, you know, her testimony --

THE COURT: It wasn't 12 miles offshore.

MR. DICKISON: No, I think we could agree with that, your Honor.

THE COURT: So basically, based on the either undisputed facts or certainly the overwhelming weight of the evidence, it happened in Belize territorial waters, and now I just have to figure out -- it was also undisputed that it's navigable waters, so now the issue is literally whether or not they have to be international waters or whether or not they can merely be navigable, and that's a pretty narrow issue.

MR. DICKISON: Yes, your Honor.

THE COURT: So when they use the word "arguable," I don't even know what that means. Arguable, sure, you're both arguing. I mean, there's a split in the authority. You can always make something arguable.

MR. DICKISON: Well, that's the language from the First Circuit, "arguable basis," so I guess that's for you --

THE COURT: I sort of wonder whether that was arguable in terms of, I mean, the next issue, which is personal jurisdiction; you know, it's arguable based on the facts that he was an agent or not. I mean, I'm not sure they meant pure questions of law. I don't know.

Anyway, why don't we move on to personal jurisdiction.

MR. DICKISON: Thank you, your Honor.

THE COURT: Can I ask one last question before I move off of this. I am deeply troubled by the fact that Amigos waited so long. I do think that the controlling case law is tough -- you know, they don't have a statute of limitations on

when they can file this thing -- but I wanted to know what the real impact is on you. Let's say I take a month or two to write this thing up, if you're lucky, so what's your situation with the statute of limitations?

MR. DICKISON: It is regrettable, but, your Honor, I think that my advice to my client is -- we have Belizean counsel that's been trying to collect -- you know, it's another thing to -- so the gist of it is, we are going to try to protect our rights, I think.

THE COURT: Will you do a protective filing?

MR. DICKISON: I think that's what we will certainly advise our clients to do. Obviously, I can't do it myself.

THE COURT: No, I understand because even if -- it sounds like she has property there anyway. It's not like a one-off that she goes there. But it just sounds like, even if I rule in your favor, there could be an appeal, and by the time -- the courts don't work well in terms of speed, and even if we're doing the best we can. So that's useful. And either way, I think this may be a debatable issue.

MR. DICKISON: I understand, your Honor, and I appreciate your concern.

THE COURT: Because she was severely hurt here.

MR. DICKISON: Yes.

THE COURT: That, I was convinced of.

All right, so personal jurisdiction, do you want to

start on that? From Amigos's point of view, I think they say there wasn't personal, I think.

MR. DICKISON: Right, absolutely they dispute personal jurisdiction. Again I would say the same standard applies, the "arguable basis," whatever that means. I think --

THE COURT: I think it may be arguable, but I think it fits more when it's -- anyway, it can't just mean you can argue about it. It must mean something more than that.

MR. DICKISON: Your Honor, I would say that --

THE COURT: I was going to start with Amigos on personal.

MR. DICKISON: Oh, I'm sorry. Okay.

THE COURT: It's their motion.

MS. KANTOR: Thank you, your Honor, and if I could just make two comments about subject matter.

THE COURT: Oh, yes, sure.

MS. KANTOR: Okay. I don't think the arguable basis standard applies. We explained that clearly in our briefs, so I suggest you look back at the cases that we cited. The *Neely* case from the Third Circuit was not based on this statute. It was based on the Jones Act. And as I said, the portion of it that talked about 1333 did not even consider what the Supreme Court had said. And the *Campbell* case is an unreported Florida case that said, "We're going to have to follow the Supreme Court, and, anyway, there's no jurisdiction here." So I'm not

really sure that gives you much comfort in following those kind of cases.

I think actually the best description of what the Supreme Court has said on this topic is in -- it's in the plaintiffs' brief, their original opposition to our first motion in Section 2. And they say, the Supreme Court, *Victory Carriers v. Law*, "Federal maritime jurisdiction applies to the navigable waters of the United States and the high seas." And they go on to describe that the high seas are international waters: "All waters seaward of a territorial sea baseline and all waters that are not in the exclusive economic zone, territorial sea, or internal waters of the United States or any other nation."

THE COURT: That's the Supreme Court case you're quoting?

MS. KANTOR: What I just quoted is a statute that they cite in their brief. So the Supreme Court said maritime jurisdiction applies to navigable waters of the United States and the high seas. And then they go on to quote 33 CFR 2.32 which defines high seas as --

THE COURT: I see. You were quoting from the regulation.

MS. KANTOR: Right, which they quoted. This is what they said in their opposition. They agree, high seas has to be outside the territory --

THE COURT: Whose regulation is that?

MS. KANTOR: It's the Code of Federal Regulations.

THE COURT: I know, but is it -- in other words, I don't usually follow --

MS. KANTOR: Okay, it's 33 CFR 2.32, admiralty.

THE COURT: No, but is it NOAA or is it -- I mean, I don't have regulations in the Federal Courts that govern, you know, like, how I think about it. Is it a NOAA or a Navy regulation?

MS. KANTOR: No, it's not a Navy regulation. It is cited in these cases that they cite.

THE COURT: All right, well, I'll look at it. Get to personal.

MS. KANTOR: Right, if you look at Pages 13 and 14 of their brief in opposition to our original motion, I think you'll find the answer.

Oh, I'm sorry. So on to personal. You know, your Honor, when we last met, the Court was very concerned about what Mr. Carballo had to say, if you recall, because Ms. Flaherty's interaction was only with this one person before she arrived in Belize. I think we all agree with that. She had some Facebook interaction with him, and he testified he talked to her on the phone. She did not remember talking to him on the phone.

The personal jurisdiction, the first thing that's

required is a contact by the company in the United States. So what the court raised was, well, did he represent the company or not? And the testimony was clear that he was not an employee. He testified repeatedly he was not authorized to --

THE COURT: Excuse me. Whether he was a formal employee or an independent contractor is not the key issue. It's whether he was an agent.

MS. KANTOR: Got it. So he testified --

THE COURT: There was a lot of ink spread about him, whether he was an independent contractor or employee or -- what was the other term?

MR. DICKISON: Freelancer.

THE COURT: Freelancer, freelancer, all right, whether he was an agent.

MS. KANTOR: Sorry for that ink. He testified repeatedly he had no authority to represent Amigos. He could not negotiate terms. He could not even sell a trip. He didn't know what the prices were when she asked him, and he had to go get the price list that sits out in the public, take a picture of it and send it to her. He wanted to dive with her because they're family. He kept saying, "We're family. We've been diving together for 13 years. If they're going to come down, I want to dive with her as just another diver."

He was not a dive master. There's a lot of ink on that too, but he was not a dive master. He was not working the

dive. He was just going to have fun with his friends.

So the first requirement that there be contact by somebody who is Amigos is just not met because he wasn't Amigos, and he kept saying he wasn't Amigos. He had no authority. He had no ability to do anything to represent Amigos.

Now, everyone else testified consistently --

THE COURT: I thought his testimony was he was a freelance employee or something like that.

MS. KANTOR: Freelance -- well, he thought he was an employee, that's fair.

THE COURT: That's what his testimony is.

MS. KANTOR: Right.

THE COURT: I don't remember -- he had that cute phrase, "free employee." I didn't know whether that was a legal status I could think about, but, in any event, he -- what about, couldn't he be an apparent agent, or couldn't she think that he was basically representing -- he was coming in. He got the price list from them. He basically was recruiting them to come to Amigos. Amigos does a ton of business, in fact, they said 85 to 90 percent of its business, in the U.S. If we go with an arguable standard --

MS. KANTOR: Which, first of all, we don't agree with.

THE COURT: -- it sounds arguable.

MS. KANTOR: Well, let me say first, the standard

under the First Circuit is not what she believed. It's not apparent authority. It's not, "I thought this company was coming into Massachusetts." It's that they have to directly have forum-related activities.

THE COURT: He was recruiting her.

MS. KANTOR: He was not -- your honor, she reached out to him. He wasn't recruiting her.

THE COURT: He was recruiting her to Amigos. There was some email exchange that I read.

MS. KANTOR: There's one Facebook exchange.

THE COURT: Facebook, I'm sorry.

MS. KANTOR: Right, where she says, "Where are you working now? Is it some other name?" And he said, "No. Amigos.

"Okay."

And her husband testified: "Well, we only wanted to know where he was working because we wanted to dive with him because he's our family."

He wasn't recruiting them to go anywhere. They wanted to dive with him. They would have gone diving with him no matter where he worked. He didn't reach out to them ever. And then when he called her, he specifically told her, "I have no ability to do anything on behalf of Amigos. You need to either call them or walk into the shop and figure out what you're going to do, what dive you're going to do, where you want to

go, how many people want to dive."

The requirement, the first requirement is not apparent authority or what she might have thought, and that makes sense. How can we be dragging foreign companies into the United States because somebody thought that somebody --

THE COURT: That's not dragging. 85 to 90 percent of his business was with Americans.

MS. KANTOR: 85 to 90 of business in Belize is from Americans, but that doesn't mean that Amigos or anyone else --

THE COURT: Didn't they have a website? Was it an interactive website?

MS. KANTOR: No. They don't pay for anything. They don't put any ads on. They put pictures up sometimes. It was not one of those interactive where, you know, you could sign up and you could see -- now you can see the schedule. Then, you could not even see that.

THE COURT: All right, thank you. I do understand your argument.

So does defense want to make an argument? You're not even defense. You're plaintiff.

MR. DICKISON: I will, you know, look this up. It does boil down to the interaction between Tony and my client. And so, first of all, you know, I think actually the exchange is clear that he, you know -- just, again, the backdrop is, he's working for this dive company that has employees and

freelancers. They're completely based on U.S. patrons. Like are noted, 85 percent of their patrons are U.S. They're focusing on advertising on Facebook, Instagram, and WhatsApp, so they're using the WhatsApp social media -- and this is all in the record -- to communicate price back and forth. That wasn't actually what happened in this case, but that's what they're doing.

But in this particular case, Tony, who is, you know, clearly working -- he was on a website after, you know, seeking COVID relief dollars. He's got the picture of the Ambergris Caye T-shirt, and he's in the photo with the rest of the team who are employees. But back in 2019 he's interacting with our client, and there's interaction there that's clearly -- when you look at the testimony, he's being directed by the manager, Krista Paz, who operates -- because he's going to her for information: "Can you do group discounts?

"Let me check."

He gets back. There's a pursuit here, and there's an interaction, there's pricing provided, and we would submit that when you do all the analysis, you're going to come out that there is personal jurisdiction here. I commend you -- this isn't a case about a dive interaction, but Judge Casper in a case that she analyzed in 2023, *Salem Shift v. Buffalo Bike Pedal Tours*, in that case she found that there was a single transaction involving a bike, a specialized bike, and she did

all the analysis under the long-arm statute, under the due process, purposeful availment, and found that the interactions in that case merited, even though it was a single transaction into Massachusetts, personal jurisdiction. And we believe this case is, particularly the interaction that was driven here by the Facebook messaging where he's clearly a representative, clearly being directed by the principal to provide information, because that's what they're in the business for. You know, to say that they're not directing -- seeking commerce from and trying to transact business in Massachusetts is just antithetical to what they're actually trying to do.

THE COURT: All right, thank you.

MR. DICKISON: They're all about tourists.

THE COURT: So I'm basically taking this under advisement. I'm just, in candor, likely to find personal jurisdiction and up in the air on subject matter, which is maybe why you started with subject matter. Certainly, if you have a standard of arguable basis there, there's certainly an arguable basis for personal jurisdiction. I think the admiralty thing, I'm just going to have to look at the treatises and try and understand it better. I strongly doubt that I will do this opinion by the end of May. I'm going out of town; I have a big trial coming up. I just don't think it's in the cards, so I suggest protecting yourself.

MR. DICKISON: Thank you, your Honor.

THE COURT: More importantly at this point, has there been any thought to trying to settle this case?

MR. DICKISON: We did do mediation. We'll still talk about -- you know, what's unfortunate is just the insurance aspect of it. There's, like, the world's quickest insurance claim policy that they had that they blew, and so we're dealing with a situation where there's no insurance. So it's just an extraordinarily unfortunate situation all around, but we'll --

THE COURT: I mean, obviously this dive company didn't intend this to happen.

MR. DICKISON: Correct, obviously, obviously.

THE COURT: I mean, certainly everyone recognizes it was a devastating injury, so --

MS. KANTOR: And on that topic, your Honor, I don't know if you recall that you sent us to a magistrate.

THE COURT: Right.

MS. KANTOR: And I thought she was quite effective. You know, maybe after this hearing, it may be worth going back to her, let her read the transcript, if you're willing.

THE COURT: Who was it, Judge Bowler?

MR. DICKISON: Yes. It was Marianne Bowler.

THE COURT: She's very good. If she can't do it, no one can.

MS. KANTOR: It was just an idea.

THE COURT: Well, why don't you two talk and see.

MS. KANTOR: Okay.

THE COURT: I don't want to waste your time and money. At this point, you've spent a lot of time doing discovery. But I'm going to say, big picture/big picture, this woman was badly hurt, and it's really annoying that they didn't even bother to let me know they were going to be challenging it. I spent a lot of time on it back then, and it just seems like there should be a reasonableness standard. Plaintiffs are urging me to do that, but I don't know that I have case law that supports that, but it certainly shades the thing.

MS. KANTOR: Understood.

MR. DICKISON: Yes, your Honor.

THE COURT: All right, okay, so if you want to just let us know.

MR. DICKISON: Yes, definitely.

THE COURT: Do you want to let us know in a week whether you want to be referred?

MS. KANTOR: Sure.

MR. DICKISON: Yes. I'll confer with our clients, and we can do it by email. We'll talk to Maryellen.

THE COURT: Okay, perfect. Okay, thank you very much. It's extremely well briefed, and I now have a record, which is what I didn't have before, so that's useful.

Thank you very much.

MS. KANTOR: Thank you, your Honor.

THE COURT: Bye-bye.

(Adjourned, 5:17 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS ) ss.
CITY OF BOSTON )

I, Lee A. Marzilli, Official Federal Court Reporter, do hereby certify that the foregoing transcript, Pages 1 through 31 inclusive, was recorded by me stenographically at the time and place aforesaid in CA No. 20-11485, Susan Flaherty, et al v. Amigos Del Mar LTD, et al, and thereafter by me reduced to typewriting and is a true and accurate record of the proceedings.

Dated this 8th day of April, 2025.

/s/ Lee A. Marzilli

LEE A. MARZILLI, CRR
OFFICIAL COURT REPORTER